**William S. CARTER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13–87–131–CR.**

Court of Appeals of Texas, Corpus Christi.

May 31, 1988.

John H. Flinn, Sinton, for appellant.

Thomas L. Bridges, Dist. Atty's Office, Sinton, for appellee.

Before NYE, C.J., and BENAVIDES and DORSEY, JJ.

## OPINION

NYE, Chief Justice.

Appellant was charged with attempted murder and aggravated assault. The jury found appellant guilty of aggravated assault. The court assessed punishment at ten years confinement and restitution of $134,499.20. Appellant contends the trial court should have granted a new trial on the basis of jury misconduct and insufficient evidence to sustain the conviction.

By his second point of error, appellant contends that the evidence was insufficient to support the conviction. The standard for review of the sufficiency of the evidence, whether circumstantial or direct, is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Johnson v. State,* 673 S.W.2d 190, 195 (Tex. Crim.App.1984); *Wilson v. State,* 654 S.W. 2d 465, 471 (Tex.Crim.App.1983). In determining the sufficiency of the evidence to sustain a criminal conviction, we consider all of the evidence and view the facts of the case in the light most favorable to the verdict. *Castillo v. State,* 739 S.W.2d 280, 288 (Tex.Crim.App.1987). Inadmissible hearsay admitted without objection possesses probative value and is considered in determining sufficiency of the evidence. *Chambers v. State,* 711 S.W.2d 240, 245–247 (Tex.Crim.App.1986); *Gayle v. State,* 713 S.W.2d 425, 427 (Tex.App.—Houston [1st Dist.] 1986, no pet.).

The record reflects that appellant and the victim, Hunt, were working alone in a mechanic shop late one evening. While Hunt was underneath a truck, he was

doused with gasoline and ignited. He suffered second and third degree burns over 52% of his body.

A person commits the offense of aggravated assault if he intentionally, knowingly, or recklessly causes serious bodily injury to another. Tex.Penal Code Ann. §§ 22.01, 22.02 (Vernon 1974). The jury charge only contained the intentional and knowing mental states. Appellant contends the evidence is insufficient to prove he intentionally and knowingly caused serious bodily injury to the victim because he did not admit he intentionally caused bodily injury and the victim did not testify that he saw appellant throw the gasoline.

■ For purposes of proving guilt beyond a reasonable doubt, direct and circumstantial evidence are equally probative. *Hankins v. State*, 646 S.W.2d 191, 199 (Tex.Crim.App.1981). Intent may be inferred from acts, words, and conduct of the accused and may be determined by the trier of fact from all the facts and circumstances. *Romo v. State*, 593 S.W.2d 690, 693 (Tex.Crim.App.1980); *Markham v. State*, 635 S.W.2d 153, 156 (Tex.App.—San Antonio 1982, no pet.).

■ Hunt testified he was working underneath a truck when he heard appellant behind him, "Then, I turned around to look, and when I turned around to look, I got doused with gasoline and a lighter threw at me, and it was too late to move." Hunt testified that he did not actually see appellant throw the gasoline, but he could see appellant's feet and part of his body, and "[t]hen that gasoline hit me and I heard that lighter flick and I knew I was in trouble." After the flick of the lighter, there was an explosion and he was on fire from his waist up to his ear.

As Hunt tried to get out from underneath the truck, he sought appellant's help but appellant "was just laughing." Hunt went to the restroom to try to put out the fire and heard appellant threatening him. He saw appellant running to the front of the shop. He followed him. He saw appellant running to the front of the shop. He followed him. At this point, Hunt realized he needed to get help for himself, so he got

into his auto and headed towards town. He came upon a stopped police car with flashing lights. The police assisted him and called for emergency assistance.

Winkle, a detective investigator, talked to Hunt while he was awaiting the arrival of the emergency ambulance. Hunt told him that appellant had burned him. Winkle went to the premises of the fire and saw a cigarette lighter on the burned area.

A chemist's report was admitted into evidence which said trace amounts of flammable petroleum residues consistent with gasoline were found in the victim's shirt and the victim's underwear.

Burney, appellant's estranged wife and Hunt's girlfriend, testified that she, Hunt, and appellant had eaten dinner the evening of the incident. She said appellant asked Hunt to work with him on his truck that evening and Hunt agreed. In the past she would often go to the shop with them, but on that evening she did not go because appellant asked her to find something else to do. Burney testified that on one occasion appellant had said that Hunt "had burned him several occasions and he'd never get to do that again and that he would burn him one of these days."

Two witnesses testified appellant had made threats about harming Hunt. One witness remembered that appellant had said, "before Hunt burned him he would burn Hunt."

Appellant admitted that he splashed Hunt with gasoline. However, he contended that he was walking with a cup of gasoline in his hand and as he turned around, he stumbled over his feet and fell flat on the floor, spilling the gasoline from the cup. He saw the fire start, he became frightened, and he ran out of the shop. He denied igniting the lighter and pouring gasoline on anyone. He said, "I did it, but as an accident."

The jury, being the judges of the fact and credibility of the witnesses, can choose to believe or not believe witnesses or any portion of their testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex.Crim.App.1986); *Barros v. State*, 661 S.W.2d 337, 340 (Tex.

App.—Corpus Christi 1983, no pet.). We find that the evidence was sufficient that appellant's act was intentionally and knowingly committed. *See Klein v. State,* 662 S.W.2d 166 (Tex.App.—Corpus Christi 1983, no pet.). Viewing the evidence in the light most favorable to the verdict, we conclude the cumulative force of all the facts and circumstances is sufficient to allow a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. Appellant's second point of error is overruled.

■ The most serious problem in this case is pointed out in appellant's first point of error. Here, he contends a new trial should have been granted because after retiring to deliberate, the jury conducted *an experiment* and considered other evidence not introduced during the trial. Tex. R.App.P. 30(b)(7). When the jury has performed an experiment, a new trial is required if there is a showing that a new fact, detrimental to the defendant was discovered by the experiment which influenced the jury. *Douthit v. State,* 482 S.W. 2d 155, 160 (Tex.Crim.App.1971); *McLane v. State,* 379 S.W.2d 339, 342 (Tex.Crim. App.1964).

■ The rule providing for a new trial when the jury receives other evidence was designed to guarantee the integrity of the fundamental right to trial by jury—to be confronted by witnesses by restricting the juror's consideration to evidence that was properly introduced during the trial. *Bearden v. State,* 648 S.W.2d 688, 693 (Tex. Crim.App.1983); *Marinez v. State,* 654 S.W.2d 500, 502 (Tex.App.—Corpus Christi 1983, no pet.). It is fundamental in Texas and in every State of our Union, that trial by jury in a criminal case requires that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel. *Parker v. Gladden,* 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966).

The central issue here was whether appellant accidentally spilled the gasoline on the victim or whether he intentionally threw it on the victim. During jury argument, the prosecutor urged the jurors to consider, in light of the evidence concerning the positions of the appellant and the victim, how it could not have been an accident since only the upper portion of the body of the victim was burned.

During jury deliberations the jury sent three communications to the judge regarding the jury being deadlocked. Two communications were sent on the first day of deliberations: one saying they couldn't reach a verdict; the other one saying they couldn't reach a verdict "6—not guilty, 6—a. assault." They were told to continue. The next day at approximately 9:00 a.m. they sent a note to the judge requesting an explanation of what happens when the jury is deadlocked. The judge did not respond. At approximately 11:00 a.m. the jury reached a verdict of guilty. The evidence revealed that the experiment occurred between 9:00 and 11:00 a.m.

The pertinent testimony at the new trial hearing reveals the following. Juror D. Moreno testified that the experiment took place the same day as the verdict; after the experiment, five jurors changed their vote from not guilty to guilty; and the experiment was performed one time with three people "really involved" in the experiment, and all of them involved in the discussion. When asked what was the discussion with respect to the spilling of the water she replied:

> Whether he was guilty or not and had he walked with a cup of gasoline and had he tripped over—see, we could not make up our minds, and they said, 'If we do this and we prove to you that he had to have the gas spilled on his sleeve, would you all be convinced that he is guilty?' And by this time we were kind of frustrated and we wanted answers. So they put the demonstration on, and when the cup, when the person tripped over with a cup of water, the water landed on the sleeve of his shirt, and he said, 'If Mr. Carter had been walking and had tripped over, like he said, with a cup of gasoline, then the gasoline surely had to have spilled back on his sleeve, and when the explo-

sion occurred, Mr. Carter would have been, you know, ignited also. So, therefore, he would have been burned? So this is how I came to the *conclusion* that maybe he was guilty, because he didn't get burned at all. (Emphasis added)

Moreno said she remembered that the experiment took place after lunch because "we went to lunch, and we got an idea of the height of the pickup truck, and we said at lunch, 'We will see how the height of the truck is and try to conclude whether the person under that truck could have gotten the gasoline that was spilled.'" She said the information about the truck was something they observed outside of the courtroom.

On cross-examination Moreno testified that she did not really reach any conclusion that that was exactly the way the water (she evidently meant the gasoline) could have spilled; that there was still a doubt in her mind, and that she did not really consider that anything that came from the experiment was concrete. She said, the experiment "kind of convinced me that it could have been possible, but there was still a doubt in my mind." She said the jury took into account that they were dealing with water in the demonstration instead of gasoline. She agreed with the prosecutor that no conclusion was reached with the water because it was not gasoline as was told in the courtroom.

Juror Revell testified that she was very interested in the experiment. She said before the experiment she had voted "Not guilty" but she had changed her mind after it. Then the following colloquy took place:

Q. Why did you change your mind, Ms. Revell?

A. I just decided that I didn't think that it could have happened accidentally. I didn't see any way for what was described to us in the court to have happened accidentally.

Q. Resulting from what you saw from the experiment?

A. Resulting from what we saw there, plus what we were told in the courtroom.

She said nobody really said that the experiment showed it could not have happened

the way appellant said. She said she partially based her verdict on the experiment.

On cross-examination, Revell testified that the jury discussed that they couldn't exactly recreate the event and it was understood they would not be establishing new facts. She was asked whether she reached any conclusions about the way the water might have simulated the gasoline reaction by what was done in the jury room. She replied, "I think it helped me. I don't think it really made my decision for me. It did help." She said she would have come to the same conclusion at a later time, even without the demonstration. She did not take the experiment as being concrete evidence because she thought it would have to be done numerous times before any real conclusion could be drawn. She said she didn't learn anything she didn't already know by observing the demonstration.

Juror Huerta testified that she had voted not guilty. When asked what caused her to change her vote she replied, "I don't know if it was one particular thing, but I would say when we did a re-enactment of, you know, spilling the water or whatever." She said that was one of the things that changed her mind because it indicated it could not have been an accident. She did not remember what was said after the experiment. On cross-examination, she said the jury took note that the table was not the same height as the vehicle, that the person performing the experiment was not in exactly the same position of the defendant, and that they were using water instead of gasoline. When asked if she drew any specific conclusion from the experiment she said, "No. That's not what I based everything on."

Juror Laws testified she saw the experiment. When asked whether anybody said anything about what the experiment showed, she said there were still conflicting thoughts about how it could have splashed on the victim unless it was intentionally done, "and the way the cup, the way the water went up and the way that he was burned, if it was, I felt that if it was done accidentally it wouldn't have happened."

Laws said a paper cup was used, they had two chairs and "we had the shower curtain against the deal, so when the water splashed, to kind of see how far it would splash up." When asked if after that people changed their vote she replied, "No, I didn't. Just on that one thing." On cross-examination, when asked if she changed her vote based on the experiment she said, "Not just on the experiment." When asked if the experiment affected her decision she said, "Not that alone." She said she didn't draw any exact facts from the experiment.

Juror Koutny testified that the jury vote was six and six until after the experiment with the cup of water on the last day of deliberations. He said the re-enactment did not change his decision because he was voting guilty from the beginning.

Juror Foreman Vaughn testified about the experiment:

We tried to experiment in determining, by throwing a cup of water on the floor, would it glide out, or would it shoot up against the wall. The reason we did that was that being underneath the truck, if it shot up, that would be one way of determining that sure, his upper body got wet, but his blue jeans didn't—just the way, one way that we were able to determine—

He said he thought the experiment helped some of the jurors to come to his way of thinking—which was that defendant was guilty. He said that possibly the other jurors could have been swayed by the experiment, that it was soon after the experiment that they had twelve guilty votes. He said three jurors performed the experiment while nine watched. It was performed one time. His decision was not changed because he had already decided appellant was guilty.

Juror Banfield testified that the experiment of spilling the water was performed once in front of all the jurors. She said before the experiment was performed the jury was deadlocked. She said she was sure comments were made about the experiment and what it showed but she could not remember exactly what was said.

Juror Y. Moreno testified there was a demonstration in the jury room where water was spilled by two or three persons. It was her understanding that they were trying to find out "if you fell with the water, how far it would go under, well, under the truck at that time." They were talking about the gasoline that was supposedly spilled. She said she didn't get involved because she voted guilty all the time.

Juror Alexander testified that two experiments were performed. One experiment was in the shower and involved spilling water, but it did not work. The other experiment was performed one time on the day of the verdict, in the jury room, in front of all the jurors. In this experiment, he had a cup of water, he was on his knees, he fell over and the water spilled. He claimed the experiment was performed "to see how it would react, what would happen." He said two or three people made comments about the experiment, but he did not remember saying anything about the experiment to others. He did not reach a conclusion from the experiment because his mind was already made up.

Juror Cardona testified that she saw the experiment. She said "they were trying to decide, you know, how, if Mr. Carter had fallen with a cup of gasoline, how it could have gotten somebody wet, you know, under the car, and they were using the tables, not a car, the truck, but they were just _____." She said the water was spilled several times and it was done different ways different times.

Cardona described the experiment as "[T]he guy did just like he would have, you know, just like the way you would fall down if you tripped, and he pretended to trip, but he landed on his hands. He didn't actually fall, and then one of the other guys was laying under the table, you know, at an angle."

She said she was not able to reach a conclusion based on the experiment because "it didn't make sense" because they did it different ways. She said she voted not guilty before the experiment and guilty after it.

Juror Penn testified that shortly before the jury returned a verdict they had performed an experiment in the jury room where two or three members of the jury spilled some water out of a cup, purportedly in the manner in which gasoline was spilled by appellant. She said that the experiment did not change her mind because her mind was made up before it began.

Juror Cantu testified she had been voting not guilty. She said they performed demonstrations in the jury room. She referred to one being performed in the shower and one involving a table with a person falling down with a cup. Her testimony revealed that the jurors had measured the distance between the truck and ground in inches using a paper. She said that spilling the water did not affect her decision.

It was uncontroverted that the experiment took place which was a re-enactment of the appellant's testimony. Four jurors testified that the way the water splashed during the experiment revealed that it probably was not an accident, as appellant claimed. (Jurors Huerta, Laws, Moreno, Revell). The State argues that since these juror's on cross-examination said no definite conclusion was reached from the experiment, no new fact was established by the experiment. However, there was ample testimony in the record that the experiment revealed that water, when spilled in a manner purported to be similar to the incident, splashed in a direction that was inconsistent with appellant's testimony of how the gasoline spilled. When the jurors' entire testimony is considered it is clear to us that some of the jurors considered the results of the experiment and that it influenced their ultimate conclusion that appellant was guilty.

Jury members are expected to draw on their general experiences and perceptions while deliberating. But in the case before us the experiment conducted was not merely an application of everyday experience; it was a conscious and contrived experimentation that did not come from the witness stand. The defendant did not have the right of cross-examination or counsel. Accordingly, we find the trial court erred in overruling the appellant's motion for new trial. Tex.R.App.P. 30(b)(7).

The judgment of the trial court is REVERSED AND REMANDED for a new trial.