

# NUMBER 13-22-00232-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**ROBERT DEAN YANCY JR.,**                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                       **Appellee.**

---

### On appeal from the 24th District Court
### of Victoria County, Texas.

---

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Silva and Peña
Memorandum Opinion by Chief Justice Contreras**

Appellant Robert Dean Yancy Jr. challenges his conviction on one count of continuous sexual abuse of a young child, a first-degree felony for which he was sentenced to life imprisonment. *See* TEX. PENAL CODE ANN. § 21.02(b).[1] On appeal, Yancy

---

[1] Because he was convicted under penal code § 21.02, Yancy is not eligible for release on parole. *See* TEX. GOV'T CODE ANN. § 508.145(a)(2).

argues the trial court abused its discretion by denying four motions for mistrial—three concerning inadmissible testimony and one involving alleged juror misconduct—and his motion for new trial. We affirm.

## I. BACKGROUND

The indictment alleged that Yancy committed two or more acts of sexual abuse against R.B., a child under the age of fourteen, between 2018 and 2021. *See id.*

At trial, sexual assault nurse examiner (SANE) Mara Beth Israel-Uebe testified she examined R.B. on December 7, 2021. R.B. was ten years old at the time. According to Israel-Uebe, R.B. reported that Yancy committed various acts of sexual abuse against her, including penile penetration of her mouth, penile and digital penetration of her sexual organ, and penile and digital penetration of her anus. R.B. reported that the abuse started when she was seven years old and "kept escalating" until she was ten. R.B. said Yancy was her mother's boyfriend, and he would commit these acts whenever her mother left for a long time or went to work. The acts occurred in the family's trailer and in hotel rooms. R.B. reported that Yancy would stop her from leaving and would instruct her not to tell anyone; after the abuse, he would "treat [her] like a princess." When her younger brother J.B. was in the room, Yancy would instruct J.B. to turn around and watch television, and would beat him if he disobeyed. R.B. told Israel-Uebe that on two occasions, Yancy gave her something to "breathe . . . in" which made her "feel weird" before abusing her. R.B. also informed Israel-Uebe that Yancy would physically and verbally abuse her mother, K.F.

Israel-Uebe testified that her physical examination of R.B. revealed "three different areas that appeared to be scar tissue" on her vaginal area, including "V-shaped notch[es]"

"at both 12:00 . . . and 6:00 . . . on her hymen" and on her posterior fourchette, which is "the most common area that women tear during childbirth" and is "where we most often see injury during sexual assault." Israel-Uebe also observed scar tissue on R.B.'s anus. She testified that these injuries were "consistent with repeated forcible penetration."

K.F. testified she was in a relationship with Yancy for four years. They lived together with her children in an apartment for most of that time but were evicted in 2020. The family lived in hotels and eventually moved into a trailer. In December 2021, the children's father, M.B., called K.F. crying and told her to get home as soon as possible. When she came home, M.B. told her to speak with R.B., and R.B. told K.F. about Yancy's abuse. K.F. called the police, took R.B. to the SANE examination, and took both children to forensic interviews. K.F. said she ended her relationship with Yancy after learning of the abuse and later reunited with M.B.

According to K.F., R.B. had previously once told her that Yancy "touched" her. At that time, K.F. confronted Yancy about the allegation, and he denied it. K.F. continued her relationship with Yancy until R.B. made the outcry of abuse in December 2021. On cross-examination, K.F. conceded that she was not employed from November 2018 through March 2020, and she agreed that Yancy had asked her to quit her job so she could stay home with the children.

R.B., who was still ten years old at the time of trial, testified consistently with her report to Israel-Uebe. She also said that Yancy would make her wear clothes with "skin showing" that belonged to her mother. J.B., R.B.'s ten-year-old brother,[2] testified he did

---

[2] R.B. was born in June of 2011 and J.B. was born in March of 2012.

not like Yancy because "[h]e raped my sister."[3] He said Yancy would have "porn playing on TV" and would call R.B. to his bed in the trailer "[e]very time mom went to work." He would get in trouble if he did not face the corner, and he could hear "heavy breathing." J.B. said he did not tell K.F. about the abuse because Yancy would not allow him to talk to her. He agreed that he told the forensic interviewer that Yancy was "grooming" R.B. to "replace" K.F.[4]

Yancy was arrested and interrogated by Detective Christina Tate of the Victoria Police Department.[5] Prior to trial, Yancy moved to suppress the video recording of the interview, and the trial court overruled the objection on the second day of trial, finding that "law enforcement complied with the requirements of the Texas Code of Criminal Procedure."[6] The recording was entered into evidence and played for the jury. Tate testified that Yancy "contradicted himself several times and didn't want to talk about why he was there really." She said that Yancy blamed the abuse on M.B.

Yancy's mother testified in his defense. She identified several photographs

---

[3] On cross-examination, J.B. stated that "rape" means "sexual abuse." He said he knew what these terms meant from watching *Law & Order*.

[4] The forensic interviewer testified that J.B. used the words "grooming," "molesting," and "brainwashed." She stated: "He's a very bright boy. He just—I did ask him, What does that mean to you? And he was able to tell me in his own words what it meant, which mirrored the definition of that word."

[5] Tate said she sought an arrest warrant prior to interviewing Yancy because, based on the evidence police had obtained, this was "an egregious case."

[6] By his first issue on appeal, Yancy contends the trial court erred by not entering written findings of fact and conclusions of law concerning whether his statement to police was voluntary. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 ("In all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions."); *Vasquez v. State*, 411 S.W.3d 918, 920 (Tex. Crim. App. 2013) ("[W]ritten findings are required in all cases concerning voluntariness."). We abated the appeal on March 29, 2023, and remanded to the trial court for the entry of such findings and conclusions. On April 5, 2023, the trial court filed findings and conclusions consistent with its oral ruling, and we reinstated the appeal. We therefore overrule Yancy's first issue as moot. We note that Yancy does not raise any issues concerning his statement to police in his brief, and he has not filed an amended brief raising any such issues.

4

depicting Yancy and the children appearing happy together, and they were entered into evidence. She testified that R.B. called Yancy "[D]addy" and always appeared comfortable and affectionate with him. She also said she was a former police officer, and she did not see any signs of child abuse toward R.B.

After the close of evidence and the charge conference, the trial court was given a note from the jury which read: "We wish to know if long term sexual abuse of a minor might lead to a form of 'Stockholm Syndrome.' We request a recall of the last qualified witness to address this question. Respectfully[,] the jury." The trial court read the note to the attorneys at the bench, and defense counsel moved for mistrial. Following a recess, the court noted that the jury had previously been admonished not to "take notes unless otherwise instructed" and that "[t]he evidence which you are to consider[] consists of testimony of witnesses and exhibits admitted in evidence." The trial court denied the motion for mistrial and instructed the jurors to "disregard any statement, any question, any discussion from any juror with regards to the question you have submitted to the Court." The trial court then reiterated the instructions which it had provided at the beginning of trial, including not to discuss any issue that was not presented in evidence.

The jury found Yancy guilty and assessed punishment as set forth above. Yancy filed a motion for new trial based on the above-referenced jury note. The motion argued that it was "highly likely 'an outside influence was improperly brought to bear on' one or more jurors by whoever initi[]ated the inquiry about 'Stockholm Syndrome,'" and it requested that each juror be subpoenaed to testify in this regard. *See* TEX. R. EVID. 606(b)(2)(A). Later, the State submitted affidavits from five different jurors, each stating in relevant part:

During [Yancy]'s trial, a note was sent to the judge presiding over the trial by the older male juror with a cane. The note asked for testimony about Stockholm Syndrome. . . . After receiving [the trial court's] instructions that we could not consider Stockholm Syndrome or any other evidence that was not admitted during the trial, we followed those instructions and did not discuss any evidence regarding Stockholm Syndrome during our deliberations.

After a hearing at which one juror testified, the trial court denied the motion for new trial, and this appeal followed.

## II.  DISCUSSION

### A.  Applicable Law and Standard of Review

"A mistrial is a device used to halt trial proceedings where error is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Guerrero v. State*, 528 S.W.3d 796, 801 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citing *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)). It is an appropriate remedy in extreme circumstances for a narrow class of "highly prejudicial and incurable errors." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009); *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003); *see Bauder v. State*, 921 S.W.2d 696, 698 (Tex. Crim. App. 1996) ("Even when a prosecutor intentionally elicits testimony or produces other evidence before the jury which is excludable at the defendant's option, our law prefers that the trial continue."). Because it is an extreme remedy, a mistrial should be granted only when residual prejudice remains after less drastic alternatives are explored. *Ocon*, 284 S.W.3d at 884–85.

We review a trial court's denial of a mistrial for abuse of discretion. *Archie v. State*, 340 S.W.3d 734, 738 (Tex. Crim. App. 2011). A judge's decision denying a mistrial will be upheld if it was in the zone of reasonable disagreement. *Id.* at 738–39. In determining whether the trial court abused its discretion in denying a mistrial, we consider (1) the

6

severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the certainty of conviction absent the misconduct. *Id.* at 739.

A defendant must be granted a new trial: "when, after retiring to deliberate, the jury has received other evidence; when a juror has talked with anyone about the case; or . . . when the jury has engaged in such misconduct that the defendant did not receive a fair and impartial trial." TEX. R. APP. P. 21.3(f), (g). We review the denial of a motion for new trial for abuse of discretion, "reversing only if no reasonable view of the record could support the trial court's ruling." *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017).

## B.    Witness Opinions on Veracity

Yancy argues by his second and third issues on appeal that the trial court erred in denying his motions for mistrial after witnesses offered inadmissible testimony. His first issue concerns the following testimony adduced at the conclusion of Israel-Uebe's direct examination:

| | |
|---|---|
| Q. [Prosecutor] | Do you believe [R.B.]'s statements to you? |
| A. [Israel-Uebe] | Yes, sir. |
| Q. | Why? |
| A. | Because children don't— |
| [Defense counsel]: | Judge— |
| THE COURT: | Objection sustained. |
| [Defense counsel]: | Judge, we'd ask— |
| THE COURT: | The jury will be instructed to disregard the question and the response. |
| [Defense counsel]: | We move for . . . [m]istrial. |
| THE COURT: | Motion for [m]istrial is denied. |

7

| Q. [Prosecutor] | Based on your training and experience, was everything that [R.B.] told you consistent with what you found on her body? |
|---|---|
| A. [Israel-Uebe] | Yes, sir. |

Yancy argues that "[t]he State's purpose in asking the question was to elicit improper expert testimony to support the . . . alleged victim's testimony." He notes that the case "was predicated primarily on witness testimony, with the credibility of the alleged victim of utmost importance."

His third issue concerns the following testimony given by Tate during her direct examination:

| Q. [Prosecutor] | . . . Can you tell us a little bit about what your strategies were going to [be] once you decided to take control of the interview? |
|---|---|
| A. [Tate] | Okay. So through my training and experience—and I've worked hundreds of these c[]ases and taken hundreds of hours in training on these kind of cases, but each one is very different. In this interview [Yancy] cried a little. He pretended to cry a lot. |
| [Defense counsel]: | Judge, I'm going to object. That's speculation on her part. |
| THE COURT: | Objection sustained. |
| [Defense counsel]: | We'd ask for the jury to be instructed to disregard her statement. |
| THE COURT: | The jury will be instructed to disregard that statement. |
| [Defense counsel]: | We move for a mistrial. |
| THE COURT: | Motion for [m]istrial is denied. |
| Q. [Prosecutor] | So was he crying? |
| A. [Tate] | There were no tears coming out most of the time. |
| Q. | Okay. So what did the—what did that cause you to do? |

8

A.                 I became frustrated. So I initially just went at him with the evidence that we had. [R.B.]'s statement from her forensic interview and SANE exam, [J.B.'s] statement from his forensic interview, and the SANE exam results conducted by [Israel-Uebe].

Q.                 And did that change his reaction?

A.                 He had a reaction to it but he still was not telling the truth and he still was blaming it on somebody else.

[Defense counsel]:   I'm going to object to that response that he's still not telling the truth.

THE COURT:      Objection sustained.

[Defense counsel]:   We'd ask for the jury to disregard that.

THE COURT:      The jury is instructed to disregard that statement.

[Defense counsel]:   We move for a mistrial.

THE COURT:      Motion for [m]istrial is denied.

As to Tate's testimony, Yancy contends that "[t]he State's purpose in asking the question was to elicit improper expert testimony to diminish [his] character." He argues that "[t]he harm to the accused in denying the mistrial was immense" because he received the maximum punishment permitted by law for this offense.

A witness, whether expert or lay, may not give opinion testimony as to the truthfulness of another witness. *See Yount v. State*, 872 S.W.2d 706, 711 (Tex. Crim. App. 1993) (concluding that "expert testimony that a particular witness is truthful is inadmissible under Rule 702"); *Arzaga v. State*, 86 S.W.3d 767, 776 (Tex. App.—El Paso 2002, no pet.) ("Although this issue generally arises in the context of expert witnesses, lay opinions must also be helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. . . . It follows, then, that a lay witness is not permitted to offer an opinion that another witness is truthful."). This type of testimony is inadmissible

9

"because it does more than 'assist the trier of fact to understand the evidence or to determine a fact in issue[';] it *decides* an issue *for* the jury." *Yount*, 872 S.W.2d at 709 (quoting *Duckett v. State*, 797 S.W.2d 906, 910, 913 (Tex. Crim. App. 1990)); *see* TEX. R. EVID. 701, 702. Similarly, a witness's opinion on the truthfulness of a criminal defendant during an investigation is also inadmissible. *Brown v. State*, 580 S.W.3d 755, 765 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd); *Gonzalez v. State*, 301 S.W.3d 393, 398 (Tex. App.—El Paso 2009, pet. ref'd). Therefore, the trial court correctly sustained defense counsel's objections to Israel-Uebe's testimony that she believed R.B. and to Tate's testimony that Yancy "still was not telling the truth."[7]

However, in both instances, the trial court promptly instructed the jury to disregard the inadmissible testimony immediately after it was adduced. In the absence of evidence to the contrary, we generally presume the jury followed the trial court's instructions. *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009); *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). Thus, "[o]rdinarily, a prompt instruction to disregard will cure error associated with an improper question and answer." *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000). In this situation, the trial court should grant a mistrial only when an improper question or answer is "clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000).

After considering the factors elucidated in *Archie*, 340 S.W.3d at 739, we cannot

---

[7] The State notes that defense counsel did not object to Israel-Uebe's testimony until after she stated that she believed R.B. and was asked "Why?" We assume, for purposes of this analysis, that the objection was timely.

conclude the trial court erred in denying Yancy's motions for mistrial based on the testimony set forth above. First, regarding severity of the misconduct, though the witnesses' testimony was improper, it was not emphasized and was not "of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *See Wood*, 18 S.W.3d at 648. Second, regarding curative measures, Yancy points to nothing in the record, other than the verdict and his sentence, indicating that the jury disobeyed the trial court's prompt and clear instructions to disregard. *See Flores v. State*, 513 S.W.3d 146, 167 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (holding the record did not show that the trial court's instruction to disregard a doctor's testimony that a sexual abuse victim was credible was ineffective in curing any prejudice). Finally, as to the certainty of conviction absent the misconduct, we note that the testimony of a victim of a sexual offense alone is sufficient to support a conviction for sexual assault of a child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07(a), (b)(1). Here, the jury heard detailed direct testimony from R.B. and corroborative testimony from J.B. regarding the acts of abuse perpetrated by Yancy. R.B. had injuries to her genitals "consistent with repeated forcible penetration." We find it highly unlikely that the complained-of testimony affected the jury's verdict. *See Flores*, 513 S.W.3d at 167 ("It is unlikely that the jury's decision to convict was influenced by the pediatrician's testimony that he believed complainant's story to be credible—the same story the jury heard from complainant."); *see also* TEX. R. APP. P. 44.2 (standards for reversible error in criminal cases).

For the foregoing reasons, we overrule Yancy's second and third issues.

## C.     Juror Misconduct

Yancy's remaining issues concern the jury note passed to the judge at the

11

conclusion of the charge conference. His fourth issue argues the court erred by denying his motion for mistrial on that basis, and his fifth issue argues that the court erred by denying his motion for new trial.

At the motion for new trial hearing, juror Ramo Giovannini was the only witness. He testified that he "had a concern about a certain psychological situation that hadn't been addressed and . . . it was important to me . . . that this question be answered." He said he therefore "elected to write up a note in private and forwarded it to the Judge." Giovannini acknowledged that there was no evidence adduced regarding this "psychological" issue, but he said he was "familiar with it and how it works or the ramifications of it." He testified: "I was wondering if anybody had any professional opinion on it because I'm not a professional." He confirmed that he "thought of it on [his] own" and "[i]t wasn't something that was discussed" with other jurors.[8] He further agreed that the issue occurred to him as a "direct result" of the defense presenting "photographic evidence" that there was "a seemingly friendly dynamic" between R.B. and Yancy. Giovannini agreed that at least one juror told him not to discuss Stockholm Syndrome; however, he testified that the issue never came up during deliberations, and that he did not do any independent research into the issue. Finally, he stated that, though he believed he needed to know the answer to the question posed in the note, the lack of such an answer did not affect his ability to reach a decision because "by the time everything was over and we were in a position to discuss the evidence in the jury room, it became very solid in my mind that . . . [Yancy] was guilty and the sentence was correct."

---

[8] Giovannini explained: "I used the royal 'we' in processing that note. None of the other jurors were involved in the writing of the note."

Yancy argues that the jury note constitutes evidence that the jurors "were not willing to follow the trial court's instructions and the law as it relates to their review of the evidence and waiting until deliberations to begin." He contends that "Giovannini acted more as a de facto member of the prosecution team, looking to direct their trial strategy to strengthen what he believed evidence of [Yancy]'s guilt, than he was an impartial juror."

We disagree. Even assuming the juror's conduct was improper, the uncontroverted evidence established that the issue of Stockholm Syndrome was not discussed in the jury's deliberations and played no part in their verdict. Giovannini's testimony established that he decided to submit the note on his own volition, based on his background knowledge, and that it was not based on any outside influence or independent research. *See Colyer v. State*, 428 S.W.3d 117, 125 (Tex. Crim. App. 2014) (noting that the "outside influence" exception to the prohibition on juror testimony in Texas Rule of Evidence 606(b)(2)(A) "does not include influences such as coercion by a fellow juror or the discussion of a juror's own personal knowledge"); *see also Carter v. State*, 753 S.W.2d 432, 438 (Tex. App.—Corpus Christi–Edinburg 1988, pet. ref'd) ("Jury members are expected to draw on their general experiences and perceptions while deliberating."). Moreover, the trial court promptly instructed the jury to "disregard any statement, any question, any discussion from any juror" regarding the note, and Yancy directs us to nothing in the record indicating that the jury disobeyed this instruction. *See Gamboa*, 296 S.W.3d at 580; *Thrift*, 176 S.W.3d at 224. The record does not reflect that any juror "engaged in such misconduct that the defendant did not receive a fair and impartial trial." *See* TEX. R. APP. P. 21.3(g). Accordingly, we conclude the trial court did not abuse its discretion in denying a mistrial or new trial based on the jury note. We overrule Yancy's

fourth and fifth issues.

### III.    CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
18th day of May, 2023.